IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

TAMEEKA JACKSON, PERSONAL REPRESENTATIVE
OF THE ESTATE OF SHAWN DEMONT JACKSON

       Plaintiff,

v.

SCHOOL BOARD FOR THE CITY OF
RICHMOND, VIRGINIA,

and                                     Civil Action No.  3:24cv528

JASON KAMRAS,
  Superintendent City of Richmond Public Schools,

and

ROBERT GILSTRAP,
  (Former) Principal Huguenot High School,

and

KEVIN OLDS,
  (Former) Assistant Principal Huguenot High School,

and

MONIQUE HARRIS,
  Guidance Counselor Huguenot High School,

       Defendants.

_____/

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

    Plaintiff, TAMEEKA JACKSON ("Mrs. Jackson") as the Personal Representative of the

Estates of her son, Shawn Jackson, alleges the following for her Complaint against the SCHOOL

BOARD FOR THE CITY OF RICHMOND, VIRGINA (the "BOARD"), JASON KAMRAS

1

("KAMRAS"), Superintendent for the City of Richmond, Virginia's public education school system, ROBERT GILSTRAP ("GILSTRAP"), former Principal of the City of Richmond's Huguenot High School ("Huguenot"), KEVIN OLDS ("OLDS"), former Assistant Principal at Huguenot and MONIQUE HARRIS ("HARRIS"), Guidance Counselor at Huguenot High School:

## INTRODUCTION

> [T]his . . . happened at a public high school graduation, in
> the middle of the summer, in the middle of the afternoon,
> with hundreds of people around.

Richmond Commonwealth's Attorney Colette McEachin. Elizabeth Holmes, Tyler Lane, WTVR 6 CBS Web Staff, *Why Amari Pollard pled guilty to murdering a Richmond high school student moments after graduation,* https://www.wtvr.com/news/local-news/richmond-high-school-graduation-murder-guilty-plea-feb-29-2024 (last updated February 29, 2024).

1.     This civil rights action seeks compensatory and punitive damages from the Defendants for violating certain rights under the United States Constitution and state law in connection with the shooting that happened after Huguenot's Graduation ceremonies on June 6, 2023.

2.     Mrs. Jackson's biological son, Shawn Jackson, was killed within minutes after the ceremony.

3.     In response to the shooting, Board Member Kenya Gibson said, "[T]he district. . .failed." Sabrina Moreno, *Report finds RPS officials knew of threats to the Huguenot student before shooting,* AXIOS RICHMOND, https://www.axios.com/local/richmond/2024/01/19/huguenot-graduation-shooting-report-faculty-teachers-threats (last updated January 19, 2024).

4.     While Board member Jonathan Young opined "[W]e have consistently . . . put our students and our teachers in harm's way." Victoria Lucas, ABC 8 NEWS, *Richmond school board*

2

*members address missteps in Huguenot graduation,* https://www.wric.com/news/local-news/richmond/richmond-school-board-members-to-address-missteps-in-huguenot-graduation-mass-shooting-report/ (last updated January 22, 2024).

5.     At the time of the shooting, RPS did not have a Director of Safety and Security as this position was unfilled.

6.     The previous Director, Maurice Tovar[1], believes the shooting was preventable, but the ". . . culture of RPS and safety . . . missed." Tyler Layne, 6 LOCAL NEWS, *He was forced out as Richmond Schools security director. A student was killed before a replacement was hired,* https://www.wtvr.com/news/local-news/maurice-tovar-richmond-school-security-feb-21-2024/ (last updated February 21, 2024).

7.     Specifically, Tovar believes that:

> I think it could have been easily prevented if [Shawn Jackson] [was] not supposed to be at graduation or on school property or at school functions. He shouldn't have been there. . . And then if someone decides that he is going to be there, then we're going to come up with a plan. We're going to meet him prior to coming [to the theater.] We're going to get him on stage, we're going to get him off the stage. He's going to be escorted out of the area. We're going to have our police friends involved, and we're going to work collaboratively with first responders.

*Id.* Unfortunately, none of this happened.

8.     The Board's investigation into the shooting agrees with Tovar's assessment. According to investigation interview transcripts, "We could have removed him [through] another exit so that he wasn't seen by the entire crowd," a care and safety associate said.

---

[1]     Defendant Kamras forced Tovar out of this position nearly a month before the shooting. RPS did not hire a replacement before the shooting happened.

9.     To continue, "Why didn't we know that he was going to be there, period? If he can't be at school for whatever reason, then you decide to let him walk?" The RPS's emergency manager described the shooting as an "intelligence failure."

10.    In the below photograph, Shawn Jackson proudly walks past Defendant Gilstrap approximately seven (7) minutes before his death:



11.    Before Shawn Jackson was murdered, the Defendants knew the dangers that Shawn Jackson faced with his family.

12.    But the Defendants did nothing to protect them or other graduation attendees.

13.    Mrs. Jackson had previously advised the Defendants that Huguenot students "had shot up their home" causing her family to become homeless.

14.    A brief time thereafter, the Defendants placed Shawn Jackson in a classroom (for a test) ". . . with people who literally tried to kill him." Olivia Diaz and Sabby Robinson, *Richmond student faced violence before graduation slaying, report says*, WASH. POST, https://www.washingtonpost.com/education/2024/01/20/huguenot-high-school-graduation-

shooting-report/ (last updated January 20, 2024).

15.     Despite these known safety and security issues, Defendant Harris "squeezed" Jackson into graduation the day of the ceremony. By doing so, the Defendants created a custodial relationship with Shawn Jackson and his family to protect them from harm.

16.     To continue, none of the Defendants completed a threat assessment as to the dangers Shwan Jackson faced and none of the Defendants escalated intelligence to security personnel.

## PARTIES

17.     Plaintiff Mrs. Jackson is an individual residing in the Commonwealth of Virginia and was at all relevant times the natural mother of Shawn Jackson. She sues in her individual capacity and as the Personal Representative of her son's estate. She seeks wrongful death damages under federal and state law.

18.     Defendant School Board for the City of Richmond Virginia is a public-school board that is responsible for overseeing the operation and management of the public education system of the Richmond Public Schools ("RPS").

19.     The Board is the body corporate for RPS and is vested with all powers and charged with all duties, obligations, and responsibilities imposed upon RPS.

20.     The Board is the public body "that governs" [the] school division" of RPS within the meaning of Va. Code Ann.§ 22.1-1, VA. Const., Art. VIII§ 7 ("The supervision of schools in each school division shall be vested in a school board"), Va. Code Ann. § 22.1-28 ("supervision of schools in each school division shall be vested in a school board"), and Va. Code Ann.§ 22.1-71 (stating that the "school board" is the "body corporate" with the power to "sue" and "be sued").

21.     Defendant Kamras is a resident of the Commonwealth of Virginia, who is being sued in his individual capacity for compensatory and punitive damages. Defendant Kamras is the current School Superintendent for the City of Richmond, Virginia.

22.     Defendant Gilstrap is a resident of the Commonwealth of Virginia, who is being sued in his individual capacity for compensatory and punitive damages. Defendant Gilstrap was Huguenot's Principal at the time of the shooting.

23.     Defendant Olds is a resident of the Commonwealth of Virginia, who is being sued in his individual capacity for compensatory and punitive damages. Defendant Olds was Huguenot's Vice-Principal at the time of the shooting.

24.     Defendant Harris is a resident of the Commonwealth of Virginia, who is being sued in her individual capacity for compensatory and punitive damages. Defendant Harris was Shawn Jackson's Guidance Counselor at Huguenot.

### JURISDICTION AND VENUE

25.     This Court has jurisdiction over Mrs. Jackson's claims pursuant to 28 U.S.C. § 1983 alleging violations of the Fourteenth Amendment to the United States Constitution as well as the laws of the Commonwealth of Virginia.

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant City of Richmond School Board resides within this Court's judicial district and a substantial and the consequential part of the events or omissions giving rise to the claims occurred within this district.

### FACTS COMMON TO ALL CLAIMS OF RELIEF

27.     Mrs. Jackson repeats and re-alleges paragraphs 1 through 27 of her Complaint as if set forth verbatim.

6

A.    **RPS Oversaw the Planning of all High School Graduations, Including Huguenot's.**

28.    In 2023 RPS decided to hold all of its graduation ceremonies for all of its secondary schools at the Altria Theater[2] ("the Altria") located at 6 North Laurel Street, Richmond, VA 23220.

29.    RPS's Chief Academic Officer for Secondary Education, Mr. Solomon Jefferson, contracted with ASM the Operator of the Altria ("Operator") on April 19, 2023, for the use of the Altria for the ceremonies.

30.    Huguenot's graduation was scheduled to be the second RPS graduation in 2023 and was the second scheduled graduation on June 6, 2023. The scheduled start time was 4:00 p.m. Huguenot's graduation followed the Richmond Community High School graduation which took place at the Altria at 10:00 a.m. earlier that day.

31.    RPS began planning its secondary school graduations in January 2022.

32.    Ms. Candace Veney-Chaplin, RPS Manager of College and Career Pathways was assigned to coordinate graduation ceremonies.

33.    Ms. Veney-Chaplin convened "June Graduation Planning/Update" meetings from April 12, 2023, through May 31, 2023, in order to set the program for the RPS graduations.

34.    Eight (8) of these meetings were held. The meetings brought together key RPS personnel to develop the plans and coordinate details for all graduations.

35.    Security planning was discussed as tasks line items during five (5) of these meetings.

36.    Ms. Veney-Chaplin responsibility was to represent the school system's central

---

[2]       RPS chose the Altria because of its long-standing history of hosting RPS graduations at this facility.

office in coordinating the "bigger logistics" of the graduation ceremonies. The individual schools' representatives were tasked with filling in distinct information for their schools' programs.

38. Huguenot's Run of Show was arranged in the following manner:

37. RPS also created and maintained a spreadsheet the provided the specific details of each school ceremony as they were developed in the planning meetings. This was "RPS Run of Show" for each school ceremony.

38. Huguenot's Run of Show was arranged in the following manner:

**TIMELINE**

| Time | Event |
| --- | --- |
| 3:00 p.m. | Graduates arrive at Altria and proceed to Ballroom. Huguenot school team to organize students in the ballroom to mirror auditorium seating. |
| 3:45 p.m. | Students and school team line up to prepare for processional. |
| 3:50 p.m. | Dignitaries line up to prepare for procession. |
| 3:55 p.m. | Students, school team, and dignitaries walk to meet at steps. |
| 3:57 p.m. | No guests are allowed to enter at this time because of the processional. |
| 4:00 p.m. | The processional begins. |
|  | Graduation program to proceed as written. |
|  | Recessional concludes the program. |

39. To prepare the logistical information that guided Ms. Veney-Chaplin's meetings, graduation coordinators representing each high school met regularly with the stated objective "to clarify expectations for a great graduation season in 2023 and to provide direct support to schools."

40. The members of this group were responsible for populating "Graduation Preparedness Checklists" for each high school graduation.

41. The checklists detailed planning information such as the status of diplomas and

diploma covers, commencement programs, interpreters, tickets, stage participants, rehearsal plans, and student bus transportation to the venue.

42.     Lead Guidance Counselor, Ms. Lisa Harrison, represented Huguenot in these meetings.

43.     Although there was a field in each checklist to provide information about graduation rehearsal plans, administrators at Huguenot never bothered to conduct graduation rehearsals at any time before the shooting.

44.     On May 30, 2023, when Mrs. Jackson asked Defendant Harris whether Shawn Jackson would participate in graduation practice, or if Defendant Harris would "squeeze him in on [graduation] day," Harris advised, "I will just squeeze him in if you feel that [graduation practice is] too dangerous."

45.     Additional graduation planning included RPS' creation of the "RPS Graduation Schedule 2023" which detailed each schools' graduation schedule, RPS leadership to be in attendance, School Board members to be in attendance, and the number of passes needed for each.

**B.      RPS's Agreement with Altria Failed to Provide Adequate Security.**

46.     While the planning of logistics for the graduation events was getting underway, RPS finalized the Agreement for use of the Altria for its graduation ceremonies on April 19, 2023.

47.     The terms and details of the Agreement were negotiated with Ms. Audrey Booth, the Altria's Event Specialist, and was signed by Mr. Glenn Major, General Manager for ASM.

48.     Booth also served as the point of contact with the schools on behalf of the Altria and was the primary source of information for the security arrangements the Altria was contractually obligated to provide under the Agreement.

49.     According to the Agreement, by payment of the sum of $45,318.64, RPS was to be

9

provided use of the Altria on June 6, 7, and 8, 2023, to conduct eight graduation ceremonies.

50.     This sum covered a licensing fee to permit use of the venue, and "Reimbursable Services Expenses" which were detailed in "Exhibit B" of the Agreement.

51.     In line-item format Exhibit B detailed the equipment, services, and labor for which Altria would be responsible. Related to security, Altria contracted to provide forty (40) walk through magnetometers[3], and RMC Event Staff to provide security.

52.     However, RMC Event Staff are "unarmed security officers" whose primary purpose "is to enhance safety & security to the students, faculty and staff throughout various locations in the greater Richmond area" through "high visibility and highly proactive engagement."

53.     The Agreement further provided:

> Operator [Altria] shall determine the level of staffing for the Services based on its reasonable business judgment. Licensee (RPS) shall inform Operator at least two months in advance of the Event, in writing, of its requirements for services and equipment in support of the Event and Operator shall take such requests into consideration when determining staffing levels for the Event. In the event that Licensee is unable to provide Operator with two weeks advance notice of its requested staffing levels for the Event, Operator's decision with respect to staffing levels shall control.

54.     In addition, the Agreement provided that "Police, Fire Marshal and EMS services shall be determined by Operator and paid by RPS."

55.     Pursuant to the terms of the Agreement, the Operator [Altria] made the determination, and RPS paid for the costs of five (5) Richmond Police Department ("RPO") off-duty officers to conduct crowd/traffic control outside of the venue.

56.     RPS also paid the costs for three (3) Fire/EMS to assist outside of the venue.

---

[3]     There is a question as to whether or not the magnetometers actually worked on the day of the shooting.

**C.     RPS Inadequately Planned Security for the Graduation Ceremony.**

57.     Despite Huguenot having two (2) assigned school resource officers ("SRO") during the 2022-2023 school year who may have had information about security issues specific to HHS, neither worked the graduation.

58.     One (1) attended as a guest and not in an official capacity.

59.     Although Altria provided security equipment and security personnel through RMC and determined the staffing level for police and emergency services outside the venue, RPS contributed personnel resources to enhance security inside the venue.

60.     In accordance with previous graduations, RPS established the staffing levels and positioning of RPS Care and Safety Associate's[4] inside the venue.

61.     In previous years, this was the responsibility of RPS' Director of Safety and Security.

62.     However, this position was vacant during the planning of the graduations.

63.     Consequently, planning related to deployment of CSAs for the graduations was done by the RPS Emergency Manager, Ms. Monica Fecht, with the assistance of CSA Supervisor, Ms. Brukisha Corbin.

64.     At the Huguenot graduation, CSAs assisted with ticket collection, organization of the graduates for procession, and facilitated crowd management and movement inside the venue.

65.     Ms. Fecht and Ms. Corbin participated in some of the graduation planning meetings

---

[4]      Care and Safety Associates ("CSA"). CSAs are unarmed personnel who, according to their job description, are required to "protect life and property, preserve the public peace, protect individual rights, prevent crime, detect law violators, enforce the Student Code of Responsible Ethics as required to maintain the efficient operation of the educational process and perform assigned duties." As unarmed personnel, the CSAs assigned to the graduation were equipped only with their Motorola XPR 3500e Radios. In addition to being unarmed, CSAs have no power of arrest and no authority other than their ability to leverage relationships with students and families to keep the peace.

convened by Ms. Candace Veney-Chaplin, communicated with Ms. Booth regarding points of entry for participants for the graduations, reviewed the staffing levels for RMC, RPD, Fire and EMS as determined by Altria, and participated in a security walk-through of the Altria with Ms. Booth on May 31, 2023, in order to determine CSA placement.

66.     Based upon this information RPS assigned nineteen (19) CSAs, in addition to Ms. Fecht and Ms. Corbin, to work the Huguenot graduation. The CSAs were pre-assigned to positions according to a map prepared by Ms. Fecht and Ms. Corbin.

67.     The assignments deployed twenty-one (21) personnel throughout the venue.

68.     The CSAs were required to report to the venue for briefings in the lobby that were scheduled to take place one (1) hour before each graduation time, which was 3:00 for Huguenot.

69.     These briefings were planned to discuss assignment locations and expectations.

70.     The briefings did not include information regarding attendees or security issues because the RPS security team did not receive a list of expected graduates or attendees.

71.     Although CSAs are trained in the use of magnetometers and in conducting security searches, the CSAs were not requested or permitted to participate in these procedures at the graduation venues.

72.     That is because the Altria and its contracted security, RMC, assumed exclusive control of these functions according to the Agreement.

73.     The security arrangements discussed during a planning meeting walk-through of the Altria in April 2023 expressed the following division of labor for security:

> If there is a situation RMC will be onsite and be the first point of contact with the parents, if they do not settle down, the RPS Safety & Security will step up, if still not resolved RPD will get involved and the person will be escorted from the Altria.

74.     RPS did not plan, discuss, consider, or contemplate any "situation" that might have happened in the areas immediately outside the venue before or after the graduation ceremony.

**D.      RPS's Communication to Huguenot Participants and Guests.**

75.     When planning of the HHS graduation was finalized, RPS anticipated the participation of as many as 3635 people: twenty-five people on the dais; 310 potential graduates; and up to 3100 graduate guests.

76.     By a "Letter to Parents and Guardians of the Class of 2023," dated May 12, 2023, Mr. Solomon Jefferson congratulated the graduates on their upcoming graduation and provided details, instructions and restrictions related to the event. In the letter, Mr. Jefferson advised of "bag checks for all visitors, similar to checks that take place at amusement parks, major sporting events and large concerts."

77.     Graduates were further advised that:

> [To] arrive at the Altria Theater one hour before the ceremony, entering at the Main Street door near Cherry Street. Only graduates can enter here; their cap and gown will be used as identification. Students should not bring phones, purses, or keys. The students will go downstairs to the ballroom to line up. Students may not leave anything in the ballroom as there is no reentry after the ceremony."

78.     In addition, RPS required all families to exit through Monroe Park.

**E.      Authorization to Participate in Huguenot's Graduation Ceremony.**

79.     Shawn Jackson was a homebound student for safety reasons.

80.     There was no restriction placed on participation in the Huguenot graduation ceremony once any student was academically cleared to graduate.

81.      But the RPS Home Instruction Handbook prohibited homebound students from participating in school-sponsored activities unless they were authorized to do so by the principal

13

or his designee.

82. Despite this prohibition, Shawn Jackson did participate in graduation without authorization from Defendant Gilstrap or his authorized designee. Yet, Defendant Gilstrap knew of Shawn Jackson's presence at the ceremony because he was seen walking with him minutes before the graduation ceremony began.

83. In the 2022-2023 school year all RPS principals were required to maintain a "Senior Leadership Team Division of Labor" spreadsheet which would detail the responsibilities of each member of building senior leadership, which included the principal, assistant principals, counseling leads and others acting as department heads.

84. The spreadsheet was also expected to detail who would be a designee for functions if a principal were not available to make certain decisions.

85. Defendant Gilstrap never bothered to prepare such a spreadsheet despite being required to do so.

86. Defendant Gilstrap's failure led to Shawn Jackson's participation in graduation occurred without any consideration of or adherence to required authorizations, and without proper vetting and consideration of the safety concerns that were known by certain administrators and staff at Huguenot.

87. Although the RPS "Monroe Park Shooting Report" dated July 20, 2023, stated that Defendant Harris was Defendant Gilstrap's designee who authorized Shawn Jackson's participation in graduation ceremony, Defendant Harris never discussed Jackson's participation with Defendant Gilstrap or any other member of the leadership team. Indeed, Defendant Harris kept this information to herself when she had an affirmative duty to tell others.

14

88.     As the Huguenot principal during the 2022-2023 school year Defendant Gilstrap[5] had ultimate responsibility for all activities and processes related to Huguenot.

89.     Mr. Jefferson described Mr. Gilstrap's status as principal at HHS during 2022-2023 as "checked-out."

90.     Mr. Jefferson learned about Defendant Gilstrap's disengagement in or about April or May of 2023, but other crises at another high school caused Huguenot to be a "second priority."

91.     Defendant Gilstrap was further described as a principal who did not provide leadership and direction to building staff, took a laissez-faire approach to managing the building, and who ". . . was not fully present" in principalship role. It was well known that he was looking for another job.

**F.      RPS Knew of Safety Issues Involving Shawn Jackson But Did Nothing to Protect Him.**

92.     Shawn Jackson received homebound instruction during the 2022-2023 school year.

93.     Before the graduation ceremony, the Defendants knew about the safety and security issues surrounding Shawn Jackson.

94.     Specifically, Mrs. Jackson advised Defendant Harris about the following:

| Date | Commentary |
|---|---|
| 11/15/21 | Mrs. Jackson advised Defendant Harris that Shawn Jackson and his family were in hiding because of the incident with one of his friends. Defendant Harris responded, "I am aware of the incident ... reach out to Mr. Olds or Mr. Gilstrap regarding your safety concerns .... " |
| 6/8/22 | Via email, Mrs. Jackson advised the Defendants Harris and Gilstrap copying Defendant Kamras |

---

[5]      A Principal Director supervised Mr. Gilstrap, though during most of the 2022-2023 school year the Principal Director position was vacant, and responsibilities of the Principal Director were covered by Mr. Jefferson, the Chief Academic Officer, who still retained numerous other roles and responsibilities.

| Date | Commentary |
|---|---|
|  | that "we are still homeless from our home being shot up, by students in Huguenot. |
| 6/13/22 | Defendant Harris wrote to Mrs. Jackson "I know you had some concerns regarding [Student] attending school in person due to the threat of neighborhood violence. |
| 9/7/22 | Defendant Harris wrote to Defendant Gilstrap "He is on homebound due to the ongoing mental health issues as well as the threat of neighborhood violence stemming from his association with another student that was involved in a crime." |
| 1/31/23 | Regarding Shawn Jackson doing testing in person at Huguenot, Mrs. Jackson wrote to Defendant Harris, "[Student] have some kids their (sic) that I don't need him having contact with ... so just throwing him in there at a time when kids are still arriving to school, is very unsafe." |
| 2/2/23 | After Shawn Jackson was in the Huguenot building to take a test, Mrs. Jackson emailed Defendant Harris, "I thought when [Shawn Jackson] came there to test he would be isolated. He was in the class with people who literally tried to kill him .... Those kids could have had somebody in the parking lot waiting to follow him or anything." |
| 5/30/23 | Mrs. Jackson asked Defendant Harris if Shawn Jackson would participate in graduation rehearsals or if Defendant Harris would just squeeze him in during the graduation ceremony. Defendant Harris advised, "I will just squeeze him in if you feel that it's too dangerous." |

**G.    RPS Failed to Assess and Share Information Regarding Threats to Shawn Jackson's Safety.**

95.    Defendant Harris and others had information regarding threats to Shawn Jackson's life but did not share that information to determine needs or the preparation of a threat assessment to protect him.

96.    The aforementioned June 8, 2022, email was copied to Defendants Gilstrap and

Kamras.

97.     Defendant Kamras then forwarded the email to the Director of Secondary Success Pathways, Ms. Laura Faulcon, who sent guidance to the HHS team (Principal Gilstrap, Counselor Harris, and Lead Counselor Harrison) to provide Shawn Jackson and his family with "support." No more. No less.

98.     Defendant Gilstrap never responded to this email.

99.     In response to prodding from Ms. Faulcon and Defendant Kamras, Defendant Harris did offer "support" regarding homebound education for Shawn Jackson.

100.    However, none of the recipients sent this information to any security personnel inside or outside RPS attendant to determine the security issues associated with Shawn Jackson's home being "shot up" by other Huguenot students.

101.    Three (3) Huguenot CSAs were present at the June 6, 2023, graduation.

102.    None of these three (3) received any information detailing the safety and security issues related to Shawn Jackson.

103.    Despite having as one of their essential job duties the responsibility to (a)"work collaboratively with school-based staff including school administrators to identify and address safety concerns"; and (b)"serve as a member of both school-based threat assessment teams and school culture and climate teams."

**H.     RPS Did Not Prepare a Threat Assessment as Required by State Law.**

104.    The Commonwealth of Virginia requires that "each school board shall adopt policies for the establishment of threat assessment teams, including the assessment of and intervention with individuals whose behavior may pose a threat to the safety of school staff or students" in the 2022- 2023 school year.

105.    At the time of the underlying shooting, RPS had in place a Behavioral Threat Assessment and Management Handbook ("Threat Assessment Handbook").

106.    Page two (2) of the Threat Assessment Handbook identifies "staff" as mandated reporters for "report of threatening behavior, statement or actions."

107.    The Handbook further defines threat as "any communication or behavior that indicates an individual may pose a danger to the safety of school students or staff through acts of violence or other behavior that would cause harm to self or others."

108.    Despite the existence of the threat assessment policy and its guidance which advises that once a potential concern is reported to a mandated reporter, the threat assessment team is expected to "ensure that immediate safety threats are mitigated, and any other necessary crisis response have been initiated. Team then engages in intake and triage." No one communicated the threats being made against Shawn Jackson's life as required by State law.

109.    Moreover, no one vetted this information as required by State law.

110.    On February 2, 2023, when Shawn Jackson came to Huguenot to take a test, Mrs. Jackson immediately emailed Defendant Harris that Shawn Jackson had been placed in "class with people who literally tried to kill him .... Those kids could have had somebody in the parking lot waiting to follow him or anything."

111.    Though meeting the definition of a threat under the threat assessment policy, Defendant Harris, a mandated reporter under the policy, did not report this information to an administrator (or anyone else) to initiate a threat assessment.

112.    Defendant Harris did not appreciate the dangers that Shawn Jackson faced and ignored the hazard of him attending the Huguenot graduation ceremony with those who "literally tried to kill him."

## I. The Altria Lacked Necessary Security.

113. RPS determined where people entered and exited the Altria for all of its graduation ceremonies, including Huguenot's. Thus, RPS controlled the movements of graduates, dignitaries, administrators, staff, guests, and others for the graduation ceremony.

114. RPS required that ticketholders entered only through the Altria's Front Entrance, and that this entrance was at all times equipped with magnetometers.

115. Staff, graduates, and dignitaries, on the other hand, entered the building through doors other than those designated for their entry.

116. Only one (1) RMC employee staffed the graduates' entrance before the 4:00 p.m. start time for the Huguenot graduation.

117. This sparse staffing existed though planning anticipated at least 310 graduates would use this entry point in the hour leading up to 4:00 p.m.

118. But there was no plan between RPS and Altria for "situations" that occurred in the areas immediately in the vicinity of the venue.

119. The lack of security and police presence caused the City of Richmond, Virginia's Police Chief to opine: "[Y]ou could make that argument that on the way to this event, if [the admitted murderer of Shawn Jackson] been stopped with that gun and had been charged with it, then this series of events never occurs." Tyler Lane, WTVR 6, *Richmond police chief says there's still more to learn about Graduation Day shooting*, https://www.wtvr.com/news/local-news/richmond-police-chief-on-graduation-day-shooting-march-1-2024 (last updated March 1, 2024).

## J. The Huguenot Graduation Ceremony.

19

120.   After Huguenot students entered the building, they were required to assemble in the ballroom before the procession into the theatre upstairs.

121.   In the ballroom the students were lined up in alphabetical order.

122.   They were provided with index cards on which to print their names. Huguenot support staff was present to assist them with organizing their caps, gowns, regalia, and attire before beginning the processional.

123.   The staff members were Mr. Lyon Sanchez-Concha, Mr. Kevin Monroe, CSAs Ms. Brigette Flowers, and Ms. Peggy-Anne Manis. Other staff floated in and in and out of the ballroom while the students were assembling.

124.   Shawn Jackson arrived late to the ceremony.[6]

125.   Defendant Gilstrap was aware of Shawn Jackson's presence, spoke with him while they walked him through the Altria's lobby.

126.   In addition, CSA Bridgette Flowers saw Shawn Jackson walking with Defendant Gilstrap through the lobby after the students had processed into the auditorium moments before the Graduation ceremony began.

### K.   The Processional Out of the Altria Auditorium.

127.   At the conclusion of the graduation ceremony, the procession out was led by the dignitaries and staff from the dais, who assembled at the Laurel Street exit in a "tunnel" formation.

128.   This formation was planned to allow the graduates to pass through and be greeted by those who had been on the dais.

---

[6]   Huguenot's graduation video supports Shawn Jackson's late arrival to the Altria. When the students whose names start with the letter "j" are called, Shawn Jackson comes on stage, presents his name card to the announcer, and is announced out of sequence. The sequence of the names called were "G. Jackson", "O. James", and then after a pause of 28 seconds and the reshuffling of diplomas by Defendants Harris Gilstrap, Shawn Jackson appears on stage and then his name is read.

20

129.   Once the dais participants were in place in the tunnel formation, stretching from the vestibule out to the sidewalk along Laurel Street, the graduates began their procession out of the Altria, exiting each row in the alphabetical order in which they had been called to the stage, starting with "As" and ending with "Zs."

130.   According to the security plan that RPS created, all students and the families were required to exit "towards Monroe Park" across Laurel Street.

131.   CSAs were assigned to stay inside the Altria while the Students and staff processed out to retain guests until all students had exited the building. After the students exited, the guests also exited toward Monroe Park.

132.   According to the graduation plan, approximately 3,600 people were expected to exit onto Laurel Street toward Monroe Park at the same time.

133.   With the 22 CSAs and CSA supervisors assigned responsibilities inside the venue at release, and RMC staff assigned to provide only building security upon entry and inside the venue, the only security or emergency response presence outside the venue was an off-duty RPD staff of five, and an off-duty Fire/EMS staff of three.

134.   This is a ratio of one security personnel for each 780 expected persons exiting toward the park, and a ratio of 1 Fire/EMS personnel for each 1300 persons exiting.

**L.     The Underlying Shooting of Shawn Jackson and Others.**

135.   Mrs. Jackson has described her son's shooting as follows:

> I see a commotion and I see my husband try to block somebody. I see my son Shawn coming out me fast-paced; I see him shoot my son in the back of the head twice and then I hear a bump, my 9-year-old was hit by a car.

Elizabeth Holmes, Tyler Layne, WTVR CBS 6 Web Staff, *Richmond man Amari Pollard pleads*

21

*guilty in Graduation Day shooting,* https://www.wtvr.com/news/local-news/amari-pollard-trial-feb-26-2024 (last updated February 29, 2024)

136. Apparently, chaos then ensued as numerous others pulled out their guns and began shooting.

137. Shawn Jackson's step-father, Renzo Jackson, was also killed.

138. Other family members were grazed by bullets with Shawn Jackson's younger step-sister being struck by a car as she fled for safety. Others were also shot.

## COUNT I

### Municipal Liability for Failure to Properly Train (42 U.S.C. § 1983)
### Defendant School Board for the City of Richmond, Virginia

139. Mrs. Jackson repeats and re-alleges the allegations in paragraphs 1 through 138 of her Complaint as if set forth verbatim.

140. For the purpose of determining liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), local school boards in Virginia are treated as municipalities. See *Riddick v. Sch. Bd. of Portsmouth*, 238 F.3d 518, 522 n.3 (4th Cir. 2000). *Monell* permits suits against a municipality for a federal constitutional deprivation only when the municipality undertook the allegedly unconstitutional action pursuant to an "official policy" or "custom." 436 U.S. at 690–91.

141. "A policy or custom for which a municipality may be held liable can arise in four ways: (a) through an express policy, such as a written ordinance or regulation; (b) through the decisions of a person with final policymaking authority; **(c) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens";** or **(d) through a practice that is so "persistent and widespread"** as to constitute a

22

**"custom or usage with the force of law."**  *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (alteration in original) (quoting *Carter v. Morris*, 164 F.3d 215, 217–18 (4th Cir. 1999) (first citing *Monell*, 436 U.S. at 690; then citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84 (1986); then citing *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989); and then quoting *Monell*, 436 U.S. at 691)); see also *Los Angeles Cnty., v. Humphries*, 562 U.S. 29, 36 (2010)(emphasis supplied).

142.     On and for some time before June 6, 2023 (and continuing to the present time), the Board did not train its administrators, staff, employees and/or agents with respect to preparation of threat assessments when a student's life has been threatened; the safe and proper methods of disseminating information regarding threats to the proper authorities and/or entities; the preparing fulsome graduation plans to include "situations" in the immediate adjacent areas where such ceremonies are held; the ensuring that vacancies are timely filled; the ensuring that principals and other division leaders are "not checked out" and seeking employment elsewhere when they are required to do their job; the compliance with State requirements regarding the safety of students and their families; and school principals are not "checked out" and not looking for employment elsewhere when they are tasked with protecting children and others; the compliance with State requirements regarding the reporting of threats made to students; and those not presently known at the present time.

143.     The Board was well aware of these issues but did nothing to address them.

144.     "We, on many levels failed" admitted Board Member Dr. Shonda-Harris Muhammed. Tyler Lane, WTVR 6, *She says inefficiencies, operational breakdowns plague Richmond Schools: 'We failed on so many levels'*, https://www.wtvr.com/news/local-news/shonda-harris-muhammed-long-standing-inefficiencies-operational-breakdowns-plague-

richmond-schools-jan-19-2024 (last updated January 19, 2024).

145.    Harris-Muhammed further admits: "Had the administration from the central office level and the building level completed the mandated Virginia-required threat assessment– we are mandated reporters... Had we done what we were supposed to do . . . ", the shooting might not have happened. *Id.*

146.    In an interview with an investigator, Defendant Harris said she was "not aware" of the proper homebound processes for permitting Shawn Jackson to walk at graduation and was "never" trained in homebound policies. *Id.*

147.    Furthermore, the Board's investigation into the shooting determined that central office leadership and building staff all had different views on whether they had to strictly follow homebound policy. The district's chief academic officer said that "probably zero" principals had even read the homebound handbook. *Id.*

148.    "Training issues" and "minimal oversight" were problems identified with RPS's homebound policy. *Id.*

149.    The above failures are so closely related to the deprivation of the decedent's and Plaintiff's rights to be a moving force that caused the ultimate injury, *i.e.,* the decedent's death. Again, others were also harmed.

150.    By failing to train its administrators, staff, and employees and/or agents, the Board acted with an intentional, reckless, and callous disregard for the lives of the decedent, his constitutional rights, and the Plaintiff's constitutional rights.

151.    In January 2023, the Virginia Department of Education's Office of School Quality determined that RPS was "deficient in its creation and implementation of effective systems and organizational structures" and had a "lack of standardized protocols."

152.   Further, a 2018 audit from the Council of Great City Schools found RPS lacked in "efficiency," "effectiveness," "internal communication," and "clear lines of authority and accountability."

153.   By reason of these acts and omissions, Mrs. Jackson was caused to incur funeral and related burial expenses, and loss of financial support.

154.   By reason of these acts and omissions, Mrs. Jackson has suffered the loss of love, companionship, affection, comfort, care, society and future support of her son and husband.

155.   Accordingly, the Board is liable for compensatory damages under 42 U.S.C. § 1983.

156.   Mrs. Jackson seeks wrongful death and survival damages under this Count.

157.   Mrs. Jackson also seeks attorney fees under this Count.

## COUNT II

### Violation of Fourteenth Amendment Right to Due Process (42 U.S.C. § 1983)
### All Defendants

158.   Mrs. Jackson repeats and re-alleges the allegations in paragraphs 1 through 157 of her Complaint as if set forth verbatim.

159.   The Fourteenth Amendment to the United States Constitution provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

160.   The Defendants are liable to Plaintiff under the Fourteenth Amendment for using their authority under state law to create a dangerous environment for her son and others. Their conduct was intentional or so reckless that it jeopardized the life, person and liberty of Shawn Jackson and others.

161.    The graduation ceremony was pre-planned and determined by the Defendants, including the time, place, and manner of how, when and where graduation attendees moved throughout the Altria, the Defendants created a special relationship between RPS and the graduation attendees, including Shawn Jackson.

162.    This is especially true for Shawn Jackson because of Defendant Harris' decision to squeeze him in despite being fully aware of the dangers that Shawn Jackson faced.

163.    By squeezing him into the ceremony, the Defendants placed Shawn Jackson under their protection, custody, and/or control.

164.    Thus, the Defendants created a greater duty to protect Shawn Jackson, and his family, from third party violence which the Defendants obviously breached.

165.    The Defendants controlled the environment for high school graduations, including Huguenot's.

166.    The Defendants determined: (a) when and where people entered and exited the Altria theater; (b) where certain people sat; and (c) otherwise managed each graduation ceremony according to a pre-determined coordinated plan.

167.    As such, the Defendants created a custodial relationship between the Defendants, Shawn Jackson, and his family.

168.    Despite having policies, practices, and customs in place that should have protected Shawn Jackson, and others from harm, the Defendants intentionally did not follow those policies, practices, and customs or exercised conscious indifference to the safety and liberty of graduation attendees and guests.

169.    Moreover, the Defendants did not follow State law with respect to reporting known threats to Shawn Jackson.

170.    The Defendants have also publicly and repeatedly admitted that RPS "failed" with respect to the shooting.

171.    Further, the Defendants exercised conscious indifference to legal mandates, their own policies, and procedures, and common-sense regarding safety and preparing their schools, staff, and security for an active shooter at a graduation ceremony.

172.    The Defendants lack of due diligence, care, thoughtfulness to following the State's legal requirements and the policies, procedures and guidelines of the Board with respect to the threats being made against Shawn Jackson and his family, and the failure to comprehend the gravity of these threats to his life shocks the conscious of any reasonable person and was not even arbitrary in application because the Defendants did nothing to protect Shawn Jackson, his family and other graduation attendees from those who "literally" wanted to kill Shawn Jackson.

173.    Such acts and omissions rise to the level of deliberate indifference and conscious indifference to a known danger, in violation of the Plaintiff's Fourteenth Amendment rights under the United States Constitution, and for which Plaintiff seeks recovery under 42 U.S.C. §1983.

174.    The Defendants are liable to Plaintiff under the Fourteenth Amendment of the United States Constitution because they assumed a duty of care with respect to the safety and security planning and implementation for the Huguenot graduation. This is especially true since the Defendants placed Shawn Jackson under their protection, custody, and/or control.

175.    Again, the Defendants breached that duty.

176.    Specifically, the government and individual Defendants failed to protect Shawn Jackson, who was in their care and to whom they owed a duty of care.

177.    Specifically, the Defendants knew of the threats that Shawn Jackson faced, but did nothing to report or address them.

27

178.    Rather, the Defendants failed to follow their own policies, procedures, and methodology when threats are made against a student's life.

179.    Put bluntly, they did nothing to protect Shawn Jackson other than "squeeze him" into an environment where individuals were present who wanted him dead.

180.    The Defendants' actions and/or inactions created a dangerous situation, which was known to them, that led to the shooting at Huguenot's graduation.

181.    Furthermore, Defendants Gilstrap and Moore failed to report any of the threats made known to them to the appropriate authorities.

182.    They did so intentionally.

183.    Moreover, Defendants Gilstrap failed to follow mechanisms in place to protect a student from when their lives are threatened. He did so intentionally as he was "checked out."

184.    Defendant Kamras knew about these dangers but took no affirmative steps to address them.

185.    Thus, the Defendants affirmatively and knowingly created an immediate danger to Shawn Jackson, his family (and others) in their custody and control.

186.    Again, the Defendants assumed a duty of care for the Plaintiff's safety and failed to keep them safe. This is especially true because they placed Shawn Jackson in their custody and/or control guaranteeing that he would be safe from harm and/or injury.

187.    The conscious decisions made by the Defendants, or lack thereof, were deliberately indifferent to the rights of Shawn Jackson, his family and others and were a moving force in causing the constitutional violations of Plaintiff and her damages.

188.    As a result of their conduct, the Defendants are liable for the decedents' injuries, and ultimate death. The Defendants failed to protect them in violation of rights guaranteed to them

under the U.S. Constitution.

189.    The Defendants' conduct was willful, wanton, malicious and done with reckless disregard for the rights and safety of the decedents and therefore warrants the imposition of punitive damages in their individual capacities.

190.    Accordingly, the Defendants are liable to Mrs. Jackson for compensatory and punitive damages, including both survival damages and wrongful death damages under, 42. U.S.C § 1983.

191.    Mrs. Jackson also seeks attorney fees under this Count.

### COUNT III

### Gross Negligence (Virginia Common Law)
### All Defendants

192.    Mrs. Jackson repeats and re-alleges the allegations in paragraphs 1 through 191 of her Complaint as if set forth verbatim.

193.    The Board had a duty to properly hire, train, and supervise those responsible for planning safety and security at Huguenot's graduation in order to protect the public against dangers likely to result from known threats to a student's life.

194.    But a systemic failure of the City of Richmond's public school system, and those who lead this system, caused the death of two citizens with others being injured.

195.    RPS's current Chief of Secondary Education Soloman Jefferson has described the 2023 school year as "disastrous" due to a "vacuum of leadership" and "so many vacancies in key levels."

196.    He blames the Board for this disaster.

197.    Meanwhile, Board Member Harris-Muhammed has opined "This is not the first

29

time that from my school board seat, and it's an honor to serve, that I have talked about the dysfunctionality in our operations . . . Houston we got a problem."

198.    The dysfunctionality was well known to the Board before the shooting.

199.    In January 2023, the Virginia Department of Education's Office of School Quality determined that RPS was "deficient in its creation and implementation of effective systems and organizational structures" and had a "lack of standardized protocols."

200.    Further, a 2018 audit from the Council of Great City Schools found RPS lacked in "efficiency," "effectiveness," "internal communication," and "clear lines of authority and accountability."

201.    The actions and inactions of the Defendants were grossly negligent, including, but not limited to:

(a)    the failure to properly follow State requirements regarding the preparation of a threat assessment protocol for the threats that were made against Shawn Jackson's life;

(b)    the failure to train employees properly and adequately regarding the graduation of homebound students from high school;

(c)    the failure to insure that an adequate safety plan was developed and implemented for the entire graduation ceremony, including the outside area of the Altria after the graduation ceremony;

(d)    the failure to have an adequate police presence at the Huguenot graduation ceremony;

(e)    the failure to communicate the threats being made against Shawn Jackson's life to the proper authorities;

(f)    the failure to follow internal procedures regarding the graduation of homebound

30

students from its high schools;

(g)   the failure to have adequate security at the Atria Theater for the entire graduation ceremony, including properly working safety devices; and

(h)   the failure to properly train and supervise employees, both professional and non-professional, with respect to threats made to a student's life.

202.   As a direct and proximate result of defendants' conduct as alleged above, and other undiscovered negligent conduct, Shawn Jackson suffered severe pain and suffering and died because of the Defendants' reckless conduct. He lost earning capacity.

203.   Furthermore, as a direct and proximate result of the defendants' conduct as alleged above, Mrs. Jackson suffered extreme and severe mental anguish and pain and has been injured in mind and body.

204.   She witnessed both her husband and son being shot and killed right in front of her.

205.   Mrs. Jackson has also been deprived of the life-long love, companionship, comfort, support, society, care, and sustenance of her son, and will continue to be so deprived for the remainder of her natural life.

206.   Mrs. Jackson is also claiming funeral and burial expenses and a loss of financial support under this claim.

207.   The Board is vicariously liable for the Defendants' actions and/or inaction under this claim.

208.   Mrs. Jackson brings this claim individually and as successor-in-interest to each decedent seeking both survival and wrongful death damages.

## PRAYER FOR RELIEF

WHEREFORE, Mrs. Jackson prays for the following relief:

(a)     For compensatory damages in excess of $15,000,000.00, including both survival damages and wrongful death damages under federal and state law, in the amount to be proven at trial;

(b)     For funeral and burial expenses, and loss of financial support;

(c)     For punitive damages in the amount of $350,000.00;

(d)     For interest;

(e)     For reasonable costs of this suit and attorneys' fees; and

(f)     For such further other relief as the Court may deem just, proper, and appropriate.

## DEMAND FOR JURY TRIAL

Mrs. Jackson demands a trial by jury on all issues within this Complaint.

DATED:

Respectfully submitted,

TAMEEKA JACKSON, PERSONAL
REPRESENTATIVE OF THE ESTATES
OF SHAWN DEMONT JACKSON

By Counsel

/s/ Joseph S. Massie, III and Brian K. Telfair
Joseph Massie, Esq. (VSB No. 35472)
JMassie@MassieLawFirm.com
THE MASSIE LAW FIRM
115 N. 1ST Street, Suite 100
Richmond, VA 23219
(804) 644-4878 (Phone)
(804) 644-4874 (Facsimile)

and

Brian K. Telfair, Esq. (VSB No. 40516)
Brian@TheTelfairLawFirm.com
THE TELFAIR LAW FIRM
4719 Nine Mile Road

Richmond, VA 23223
(804) 326-4474 (Phone)
(804) 597-2364 (Facsimile)