IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

TAMEEKA JACKSON, *Personal* )
*Representative of the Estate of Shawn* )
*Demont Jackson*, )
      Plaintiff, )
  )
     v. )      Civil Action No. 3:24CV528 (RCY)
  )
SCHOOL BOARD FOR THE CITY OF )
RICHMOND, VIRGINIA, *et al.*, )
      Defendants. )
  )

## MEMORANDUM OPINION

      This action was brought by Plaintiff Tameeka Jackson, as a personal representative of the estate of her son, Shawn Demont Jackson, after Shawn Jackson was shot and killed on June 6, 2023, seven minutes after exiting the Altria theater at the conclusion of his high school graduation ceremony. Plaintiff alleges that Defendants Monique Harris and the School Board for the City of Richmond, Virginia ("the School Board") violated Shawn Jackson's substantive due process rights and are liable under 42 U.S.C. § 1983. The matter is presently before the Court on Motions to Dismiss filed by Defendant Harris and the School Board, ECF Nos. 57, 63, as well as Plaintiff's Motion for Leave to File a Second Amended Complaint, ECF No. 93. These matters have been fully briefed, and the Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. For the reasons stated below, the Court will grant Defendants' respective Motions to Dismiss and deny Plaintiff's Motion to Amend.

## I.  RELEVANT PROCEDURAL HISTORY

      Plaintiff filed her original Complaint on July 20, 2024, Compl., ECF No. 1, and on

September 30, 2024, she timely amended her Complaint as a matter of course.  Am. Compl., ECF No. 52.  On October 11, 2024, Defendant Harris filed an Answer, ECF No. 59, her Motion to Dismiss, ECF No. 57, and an accompanying Brief in Support thereof, ECF No. 58.  On October 14, 2024, the School Board filed its own Answer, ECF No. 65, Motion to Dismiss, ECF No. 63, and an accompanying Brief in Support thereof, ECF No. 64.  On October 29, 2024, the Court issued an order directing Plaintiff to show cause as to why she failed to timely respond to Defendants' Motions to Dismiss and further directing her to file her Responses, both by November 5, 2024.  Show Cause Order, ECF No. 70.

On November 1, 2024, Plaintiff filed her Opposition to Defendant Harris' Motion to Dismiss, ECF No. 71, and her Opposition to the School Board's Motion to Dismiss, ECF No. 73. Both Defendants filed their Replies on November 7, 2024.  Harris Reply, ECF No. 76; Sch. Bd. Reply, ECF No. 79.  Plaintiff also filed her response to the Court's Show Cause Order that day, which was two days late.  Show Cause Resp., ECF No. 77.  Therein, Plaintiff's counsel explained they believed they had twenty-one days to respond rather than fourteen days, and assured the Court they would review the local rules to prevent late filings in the future.  *Id.*

On November 19, 2024, Plaintiff filed a Motion for Leave to File her Second Amended Complaint, ECF No. 85, which she later withdrew on December 13, 2024, *see* ECF No. 91.  On January 8, 2025, Plaintiff again filed a Motion for Leave to File a Second Amended Complaint ("Motion to Amend") and an accompanying Memorandum in Support thereof.  Mot. Amend, ECF No. 93; Mem. Supp. Mot. Amend, ECF No. 94.  On January 20, Defendants Harris and School Board filed their respective responses in opposition.  Harris Opp'n Mot. Amend, ECF No. 95; Sch. Bd. Opp'n Mot. Amend, ECF No. 96.  Plaintiff replied to each opposition brief separately on

January 23, 2025, Reply Harris Opp'n, ECF No. 97; Reply Sch. Bd. Opp'n, ECF No. 98, rendering the issues ripe for review.

## II.  FACTUAL BACKGROUND

When deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court "accept[s] as true the plaintiff's well-pleaded allegations and views all facts and draws all reasonable inferences in the light most favorable to plaintiff." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Mylan Labs., Inc. v. Matkari*, 7 F3d 1130, 1134 (4th Cir. 1993)).  Such a standard, however, does not require accepting any unreasonable inferences or a plaintiff's legal conclusions or arguments. *Id.* (quoting *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009)).  Applying this standard, the Court construes the facts in the Amended Complaint as follows.

### A. Events Leading to Shawn Jackson's Death

On November 15, 2021, Plaintiff advised Defendant Monique Harris, who was her son Shawn Jackson's school guidance counselor, that they were in hiding after a group of Huguenot High School ("HHS") students "shot up" the family home. Am. Compl. ¶¶ 9, 121, ECF No. 52. This incident (and what followed) was believed to be connected to the fact that one of Shawn's friends shot and killed the friend of another group of HHS students. *See id.* ¶¶ 3, 121. Defendant Harris responded, stating she was aware of the "incident" and instructed Plaintiff to reach out to the school's principal, Robert Gilstrap, and vice principal, Kevin Olds. *Id.* ¶¶ 46–47, 121. On June 8, 2022, Plaintiff informed Defendant Harris, Mr. Gilstrap, and the Superintendent for the City of Richmond's public education system, Jason Kamras, that her family was still homeless after the 2021 shooting. *Id.* ¶¶ 121, 123. A couple days later, on June 13, 2022, Defendant Harris

wrote to Plaintiff acknowledging that Plaintiff "had some concerns regarding [Student][1] attending school in person due to the threat of neighborhood violence." *Id.* As a result of the June 8, 2022 email, Shawn received "homebound instruction" for the duration of the 2022–2023 academic year. *Id.* ¶¶ 119, 126.

On September 7, 2022, Defendant Harris informed Mr. Gilstrap that Shawn was "on homebound due to the ongoing mental health issues as well as the threat of neighborhood violence stemming from his association with another student that was involved in a crime." *Id.* ¶ 121. During Shawn's homebound instruction, he came to HHS on at least one occasion for SOL testing, on February 2, 2023. *Id.* ¶¶ 121, 128. Prior to the SOL test, Plaintiff contacted Defendant Harris expressing concern about Shawn coming into contact with certain unnamed students and that "throwing him in there at a time when kids are still arriving to school, is very unsafe." *Id.* ¶ 121.

On February 2, 2023, after Shawn took his SOL test, Plaintiff contacted Defendant Harris again. *Id.* Plaintiff explained that she thought Shawn would be isolated from the other students, but instead, she learned that Shawn "was in the class with people who literally tried to kill him." *Id.* Plaintiff told Defendant Harris that those "kids could have had somebody in the parking lot waiting to follow him." *Id.*

Virginia law requires all local school boards to adopt policies for the establishment of threat assessment teams. *Id.* ¶ 133; Va. Code Ann. § 22.1-79.4. Plaintiff alleges that Defendant Harris failed to initiate a threat assessment during this timeframe despite knowing that Shawn's home had been "shot up" in 2021 by HHS students and that Shawn had been in a room with people who wanted to "kill him" during SOL testing in February 2023. *Id.* ¶¶ 122, 127–29.

---

[1] It is not entirely clear who "[Student]" is, as Plaintiff refers to her son, Shawn Jackson, by name throughout paragraph 121, including sometimes in similar brackets (i.e., as [Shawn Jackson]), and at other times refers only to "[Student]." In this context, it appears that Plaintiff is referring to Shawn Jackson.

Three months after SOL testing, on May 30, 2023, Plaintiff asked Defendant Harris whether Shawn would participate in graduation rehearsals or if Defendant Harris would "just squeeze [Shawn] in during the graduation ceremony." *Id.* ¶ 121. Defendant Harris responded, "I will just squeeze him in if you feel that it's too dangerous." *Id.*

Richmond Public Schools' ("RPS") Home Instruction Handbook prohibited homebound students from participating in school-sponsored events or activities without authorization from the principal or his/her designee. *Id.* ¶ 107. Plaintiff alleges that Defendant Harris never discussed Shawn's participation in graduation with the principal, but that she unilaterally authorized Shawn to attend. *Id.* ¶ 114.

**B. Planning and Preparation for HHS's Graduation**

RPS, managed by the Defendant School Board, oversaw and planned all its secondary schools' graduations, including that of HHS. *Id.* ¶¶ 52, 55. HHS's graduation was scheduled to take place on June 6, 2023, at the Altria Theater. *Id.* ¶¶ 52, 54. RPS held eight meetings leading up to RPS's secondary school graduations; security was an express agenda item during five of those meetings. *Id.* ¶¶ 58–59. Ultimately, RPS contracted with the Altria Theater to provide security for graduation, which would include forty walk-through magnometers and RMC Event Staff to provide physical security. *Id.* ¶ 75. Although the Altria Theater had assumed exclusive control of security for graduation, RPS supplemented the Altria Theater's security plan with twenty-one unarmed Care and Safety Associates,[2] five Richmond Police Department off-duty officers, and three Fire/EMS personnel. *Id.* ¶¶ 79–80, 90–91, 96. Although RPS planned for

---

[2] Care and Safety Associates ("CSA") are unarmed personnel who have no power or authority other than to "leverage relationships with students and families to keep the peace." Am. Comp. ¶ 84 n.4. The CSA job description includes their responsibility to "protect life and property, preserve the public peace, protect individual rights, prevent crime, detect law violators, enforce the Student Code of Responsible Ethics as required to maintain the efficient operation of the educational process and perform assigned duties." *Id.*

security during the graduation ceremony, RPS failed to plan or consider security threats or "situations" that could arise "before or after the graduation ceremony." *Id.* ¶ 99.

### C.  HHS Graduation and the Shooting of Shawn Jackson

On June 6, 2023, HHS's graduation ceremony took place at the Altria Theater. *Id.* ¶ 52. Graduation began around 4:00 p.m. with the processional. *Id.* ¶ 62. Shawn arrived late to the ceremony but ultimately walked the stage and received his diploma. *Id.* ¶¶ 34, 154, 154 n.6. The ceremony concluded with a procession out of the Altria Theater, which was led by dignitaries and staff. *Id.* ¶¶ 62,[3] 157–60. The staff formed a tunnel outside to greet the graduates as they exited the theater towards Monroe Park. *Id.* ¶¶ 157–60.

Seven minutes after Shawn exited the Altria Theater, he was shot and killed by Amari Pollard. *Id.* ¶¶ 4, 34. Pollard was a former HHS student and part of a group—which included HHS students—who wanted to kill Shawn in retaliation for Pollard's own friend being shot by a friend of Shawn's. *Id.* ¶¶ 3–5. Shawn's stepfather was also killed when he tried to protect Shawn. *Id.* ¶ 6.

### III.  STANDARD OF REVIEW

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint." *Megaro v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023) (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). A Rule 12(b)(6) motion "is not a procedure for resolving . . . contest[s] between the parties about the facts or the substantive merits of the plaintiff's case." 5B

---

[3] Plaintiff posits that the graduation ceremony continued after the recessional to include students and families gathering in Monroe Park, which is where Jackson was shot and killed, however Plaintiff's allegations are inconsistent on the issue of when the official graduation ceremony ended. *Compare id.* ¶¶ 2, 99, 159, 163 (stating that the graduation ceremony continued even after the graduated processed outside), *with id.* ¶¶ 1, 34, 62, 157 (indicating that the graduation ceremony ended following the recessional). Viewing the Amended Complaint in the light most favorable to Plaintiff, the Court finds it reasonable to infer the following: HHS's graduation began with the processional and ended with the recessional; however, it was typical for graduates to celebrate and take photographs following the official ceremony, which was known among RPS and HHS staff.

Charles A. Wright, Arthur R. Miller, & A. Benjamin Spencer, *Federal Practice & Procedure* § 1356 (4th ed. 2024). Federal Rule of Civil Procedure 8 only requires that a complaint set forth "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," "detailed factual allegations" are not required in order to satisfy the pleading requirement of Federal Rule 8(a)(2). *Id.* The plaintiff's well-pleaded factual allegations are assumed to be true, and the complaint is viewed in the light most favorable to the plaintiff. *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). All reasonable inferences that can be drawn from the complaint are drawn in the plaintiff's favor. *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020).

However, to survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Labels and conclusions," a "formulaic recitation of the elements," and "naked assertions" without factual enhancement are insufficient. *Id.* "Ultimately, on a Rule 12(b)(6) motion, the burden lies with the movant to show entitlement to dismissal." *Ziegler v. Dunn*, 2024 WL 761860, at *2 (E.D. Va. Feb. 23, 2024) (citing Wright, Miller, & Spencer, *supra*, § 1357).

## IV. DISCUSSION

Based on the circumstances surrounding her son's death, Plaintiff brings the following three claims:  Count One, for municipal liability/failure to train pursuant to 42 U.S.C. § 1983 and *Monell*,[4] Am. Compl. ¶¶ 170–238; Count Two, for a Fourteenth Amendment substantive due process violation, also pursuant to 42 U.S.C. § 1983, *id.* ¶¶ 194–238; and Count Three, for gross negligence rooted in Virginia law, *id.* ¶¶ 239–55.  The School Board is named in Counts I and II, while Harris is named in Counts II and III.  Both Defendants presently move the Court to dismiss all Counts.  The Court will first address Plaintiff's § 1983 claim against Harris, before addressing the § 1983 claims against the School Board.  The Court will then address the remaining state law claim against Harris.  Finally, the Court will consider Plaintiff's Motion for Leave to Amend.

### A.  § 1983 Claim Against Defendant Harris (Count II)

Plaintiff alleges that Defendant Harris is liable pursuant to 42 U.S.C. § 1983 for violating the Fourteenth Amendment guarantee that no person—and here particularly her deceased son, Shawn—shall be deprived "of life, liberty, or property, without due process of law."  Am. Compl. ¶ 195–96.  Plaintiff argues that Shawn's substantive due process right "to bodily integrity" was violated insofar as Harris permitted him to attend graduation when she "knew about the threats that were made against [his life] and the actions taken to carry out those threats," and she failed to initiate a threat assessment despite her knowledge.  Opp'n Harris Mot. Dismiss 2, ECF No. 71.  While acknowledging that, generally, "the Due Process Clause 'cannot fairly be extended to impose an affirmative obligation on the State'" to prevent harm from a third-party, *id.* at 7 (quoting *DeShaney v. Winnebago Cnty. Dep't Soc. Servs.*, 489 U.S. 189, 195 (1989)), Plaintiff argues that

---

[4] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

two well-recognized exceptions to this rule apply to render Harris liable in this case: the state-created danger doctrine and the special relationship exception, *id.*

A state actor who causes the "deprivation of any rights, privileges, or immunities secured by the Constitution" may be liable under § 1983. 42 U.S.C. § 1983. "Under established precedent, these constitutional rights include a Fourteenth Amendment substantive due process right against state actor conduct that deprives an individual of bodily integrity." *Doe v. Rosa*, 795 F.3d 429, 436–37 (4th Cir. 2015). However, "[a]s a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 197. In *DeShaney*, the Supreme Court made clear that the Fourteenth Amendment was intended to protect "the people from the State, not to ensure that the State protected them from each other." *Id.* at 196.

"[T]he Due Process Clause does not require the State to provide its citizens with particular protective services," and thus "it follows that the State cannot be held liable for injuries that could have been averted had it chosen to provide them." *Id.* at 196–97. Put differently, the "Due Process Clause of the Fourteenth Amendment does not require governmental actors to affirmatively protect life, liberty, or property against intrusion by private third parties." *Pinder v. Johnson*, 54 F.3d 1169, 1174 (4th Cir. 1995) (citing *DeShaney*, 489 U.S. at 193). As Plaintiff argues, courts, including the Fourth Circuit, have recognized two exceptions to *DeShaney*'s general rule against imposing liability on state actors for third party-created injury: (1) where there is a "special relationship;" and (2) where there is a state-created danger. *Turner v. Thomas*, 930 F.3d 640, 645 (4th Cir. 2019).

In support of her Motion to Dismiss, Defendant Harris argues that Plaintiff has failed to state a § 1983 claim for three reasons. First, Harris contends there was no special relationship

between herself and Shawn Jackson, because their relationship was non-custodial.  Harris Br. Supp. 6.  Second, there was no state-created danger, because Harris did not take any affirmative acts to create or increase the risk to Shawn.  *Id.* at 8.  Third, Harris asserts that, even if Plaintiff has otherwise stated a substantive due process claim, Harris is entitled to qualified immunity.  *Id.* at 9.

The Court first examines whether the facts alleged give rise to a reasonable inference that a special relationship existed between Shawn Jackson and Defendant Harris, before turning to assess Plaintiff's state-created danger theory.  Because the Court ultimately finds that neither theory is viable, the Court does not reach Harris's qualified immunity argument.

1.  Special Relationship

Harris argues that the special relationship exception does not apply to the facts alleged, because the relationship between Shawn and Harris was not custodial and therefore Harris had no affirmative duty to protect Shawn.  Harris Br. Supp. 5.  Harris also contends that the Fourth Circuit has held, and several other circuits agree, that there is no *de facto* special relationship in the context of a school-student relationship.  *Id.* at 6.  Plaintiff attempts to argue that the special relationship exception applies because Harris "squeezed" Shawn into the graduation ceremony, and because the circumstances of the case involve a school shooting.  As described below, the Court is unpersuaded by Plaintiff's arguments.

A state actor may be liable for failing to act on an individual's behalf when the "individual and the state have a 'special relationship' . . . that gives rise to an affirmative duty to protect." *Turner*, 930 F.3d at 645; *see also DeShaney*, 489 U.S. at 200 ("[I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf . . . which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty

interests against harms inflicted by other means."). Unfortunately for Plaintiff, however, the Fourth Circuit has made clear that "a 'special relationship' is all but synonymous with a custodial relationship." *Waybright v. Frederick Cnty.*, 528 F.3d 199, 207 (4th Cir. 2008) (citing *DeShaney*, 489 U.S. at 199–200; *Pinder*, 54 F.3d at 1175). And, in an unpublished opinion, the Fourth Circuit has further held that attendance in public school does not create the type of custodial relationship contemplated in *DeShaney*. *Stevenson ex rel. Stevenson v. Martin Cnty. Bd. of Educ.*, 3 F. App'x 25, 31 (4th Cir. 2001) ("When a student attends public school, his liberty is not restrained to the extent contemplated in *DeShaney*. Attending school is not the equivalent of incarceration or institutionalization. . . . [T]he state, simply by virtue of its maintenance of a public school system, does not become constitutionally liable for failing to prevent all student-on-student violence. Although the school officials here may have been irresponsible and ineffective in not heeding the warnings that [the victim] was helpless at the hands of bullies, they have not committed a constitutional violation."); *see also O.W. ex rel. Bass v. Sch. Bd.*, 656 F. Supp. 3d 596, 620 (E.D. Va. 2023) ("The Fourth Circuit has unequivocally stated that a student's attendance in public school does not create the kind of relationship contemplated in *DeShaney*." (citing *Stevenson*, 3 F. App'x at 31)). While the Court recognizes that unpublished cases are not binding, published caselaw from other Circuits provides ample persuasive support for this Court to reach the same conclusion. *See D.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1372 (3d Cir. 1992) (en banc); *Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412, 1415 (5th Cir. 1997) (en banc); *Doe v. Claiborne Cnty.*, 103 F.3d 495, 510 (6th Cir. 1996); *J.O. v. Alton Cmty. Unit Sch. Dist. 11*, 909 F.2d 267, 272 (7th Cir. 1990); *Dorothy J. v. Little Rock Sch. Dist.*, 7 F.3d 729, 732 (8th Cir. 1993); *Maldonado v. Josey*, 975 F.2d 727, 731 (10th Cir. 1992).

Plaintiff's attempts to avoid this conclusion are not persuasive. Plaintiff refers the Court to cases involving Equal Protection Clause claims, where courts have held that school officials can be liable for their deliberate indifference to student-on-student sexual harassment and assault. Opp'n Harris Mot. Dismiss 11, 13. Plaintiff further argues that, *Stevenson* notwithstanding, Harris created a special relationship with Shawn when she "squeezed" him into the graduation ceremony—despite her knowledge of the threats he faced and his participation in the homebound program—inasmuch as she "[a]ct[ed] as Shawn[]'s school guidance counselor and act[ed] to make . . . decisions for his safety." *Id.* at 11–12. Finally, Plaintiff argues that, because the government requires students to attend school—an environment that has become increasingly dangerous in light of school shootings—government actors "should be held to a greater standard," given the foreseeability of the danger. *Id.* at 12.

The circumstances of Shawn Jackson's death are tragic, as is the loss that Plaintiff suffered in this case. Unfortunately, however, Defendant Harris's relationship with Shawn does not rise to the level of a special relationship as contemplated by *DeShaney* or the Fourth Circuit. Specifically, Plaintiff's allegations regarding the affirmative actions of Harris to incorporate Shawn into graduation and her arguments about government requirements for students to attend school in no way give rise to a finding that, in so attending, Shawn was confined in the manner "needed to render a relationship custodial," which in turn is needed to create an affirmative duty for the state or state actor to assume some responsibility for his safety and general well-being. *Waybright*, 528 F.3d at 207 (citing *DeShaney*, 489 U.S. at 199–200, and then citing *Pinder*, 54 F.3d at 1175). Nothing in the facts alleged suggests that Shawn attended the graduation ceremony under duress or that he was confined or constrained once in attendance; rather, the facts suggest that he had control over his movements at graduation, as demonstrated by his late arrival. *Id.* ¶¶ 34, 154. The

Equal Protection Clause cases Plaintiff cites are wholly inapposite and do not persuade the Court to depart from the path clearly set out by the Fourth Circuit in *Stevenson* or by the Third, Fifth, Sixth, Seventh, Eighth, and Tenth Circuits, when such courts have uniformly held that the student-school relationship does not give rise to a special relationship sufficient to "trigger the [state's] affirmative duty" to safeguard an individual from third party harm under the Due Process Clause. *See Stevenson*, 3 Fed. App'x at 30–31 (collecting cases).

For those reasons, Plaintiff fails to state a claim for a substantive due process violation by Defendant Harris predicated on a special relationship between Harris and Shawn Jackson.

### 2. State-Created Danger

Harris further argues that the state-created danger exception is similarly not supported by the facts alleged. Harris Br. Supp. 6–8. The Court agrees.

"[T]he state-created danger doctrine . . . is an exception to the general rule that 'the Due Process Clause of the Fourteenth Amendment does not require governmental actors to affirmatively protect life, liberty, or property against intrusion by private third parties.'" *Burns-Fisher v. Romero-Lehrer*, 57 F.4th 421, 424–25 (4th Cir. 2023) (quoting *Pinder*, 54 F.3d at 1174). "Importantly, the state-created danger exception 'applies only when the state affirmatively acts to create or increase the risk that resulted in the victim's injury.'" *Id.* (quoting *Graves v. Lioi*, 930 F.3d 307, 319 (4th Cir. 2019)). A plaintiff cannot succeed merely by "refram[ing] a failure to protect against a danger into an affirmative act." *Callahan v. N.C. Dep't of Pub. Safety*, 18 F.4th 142, 147–48 (4th Cir. 2021).

In *Pinder v. Johnson*, the Fourth Circuit wrote:

It cannot be that the state "commits an affirmative act" or "creates a danger" every time it does anything that makes injury at the hands of a third party more likely . . . . As was true in *DeShaney*, the state did not "create" the danger, it simply failed to provide adequate protection from it. In both cases, the most that can be said of the

13

> state functionaries . . . is that they stood by and did nothing when suspicious circumstances dictated a more active role for them.

54 F.3d at 1175. The *Pinder* court went on to note that "inaction can often be artfully recharacterized as 'action,' [and] courts should resist the temptation to inject this alternate framework into omission cases by stretching the concept of 'affirmative acts' beyond the context of immediate interactions between the [defendant] and the plaintiff." *Id.* at 1176 n.*.

The state-created danger doctrine has "limited reach," and the "bar for what constitutes an 'affirmative act' is high." *Turner*, 930 F.3d at 645–646. Indeed, the Fourth Circuit has "never issued a published opinion recognizing a successful state-created danger claim." *Burns-Fisher*, 57 F.4th at 425. "Rather, [Fourth Circuit] precedent on the issue has emphasized the doctrine's limited reach and the exactingness of the affirmative-conduct standard." *Turner*, 930 F.3d at 646 (finding no state-created danger when law enforcement officers were ordered not to intervene in private violence between protestors because "state actors may not be held liable for 'st[anding] by and d[oing] nothing when suspicious circumstances dictated a more active role for them'" (quoting *Pinder*, 54 F.3d at 1175)); *see e.g.*, *Burns-Fisher*, 57 F.4th at 425–26 (finding no state-created danger after a teacher was attacked by a student, who was known to be violent, because defendant, the school principal, did not directly cause plaintiff's injuries and at best failed to protect plaintiff); *Rosa* 795 F.3d at 411, 431, 434–35 (finding no state-created danger after a college president failed to intervene after learning that a counselor sexually abused campers for several years because the affirmative acts were committed by the counselor, not the college president); *Pinder* 54 F.3d at 1172, 1175 (finding no state-created danger after law enforcement officers assured plaintiff that her former boyfriend would be held overnight, but instead released him, which resulted in the death of her three children); *Stevenson ex rel. Stevenson*, 3 F. App'x at 31–32 (finding no state-

14

created danger after student was brutalized by other students because failing to protect "is not sufficient to trigger constitutional liability").

In opposition to the Motion to Dismiss, Plaintiff argues that she has adequately alleged that Defendant Harris acted affirmatively, thereby creating or enhancing the danger to Shawn's life. Opp'n Harris Mot. Dismiss 9. Plaintiff also contends that rejection of her state-created danger theory is procedurally premature, because "courts should allow for discovery to occur before determining whether the state-created danger doctrine applies if the alleged facts are sufficient at the pleading stage." *Id.* at 8, 10 (citing *Doe #1 v. Montgomery Cnty. Bd. of Educ.*, 2021 WL 6072813 (D. Md. Dec. 23, 2021); *DJ ex rel. Hughes v. Sch. Bd.*, 488 F. Supp. 3d 307, 325 (E.D. Va. 2020)). The Court will first address Plaintiff's affirmative act argument, before turning to her procedural argument.

### a. Affirmative Act

Upon review of the allegations in the Amended Complaint, the Court identifies three alleged "acts" by Harris prior to Shawn's death. First, Harris approved Shawn's participation in HHS's homebound program. Am. Compl. ¶ 126. Second, Harris did not initiate a threat assessment, despite her knowledge of the threats to Shawn's life. *Id.* ¶¶ 122, 129, 140. Third, Harris unilaterally approved Shawn's attendance at and participation in HHS's graduation ceremony. *Id.* ¶ 114.

Harris argues that these alleged actions and/or omissions fail to meet the Fourth Circuit's exacting standard to qualify as legally actionable "affirmative acts." Harris Br. Supp. 8; Harris Reply 5–6. For her part, Plaintiff relies heavily on *DJ ex rel. Hughes* to argue that she has plausibly alleged a state-created danger claim. Opp'n Harris Mot. Dismiss 9. In particular, Plaintiff notes that the complaint in *DJ* survived a motion to dismiss, in part, because "the school knew about

prior incidents involving harm to the student, the school indicated to the parents that they would take action to protect the student from harm, and the injury to the student occurred while the attackers and student were under the temporary control of the school." *Id.* (citing *DJ ex rel. Hughes*, 488 F. Supp. 3d at 328). As described below, the Court finds that the present case is materially distinct from *DJ ex rel. Hughes*, and otherwise that Plaintiff has not alleged "affirmative acts" sufficient to give rise to liability on the part of Defendant Harris.

### i. DJ ex rel. Hughes *is not sufficiently analogous to the present facts to control the outcome in this case.*

In *DJ ex rel. Hughes* [hereinafter *DJ*], the plaintiff sued for violation of his substantive due process right to bodily integrity after he suffered assault at the hands of his teammates while changing in the boys' locker room, after a similar assault upon another student had occurred and been made known to coaching staff and after coaching staff had assured the plaintiff's parents that the boys would not be unsupervised in the locker room thereafter. *See generally DJ ex rel. Hughes*, 488 F. Supp. 3d at 317–21. Conducting its 12(b)(6) analysis, the district court ultimately found that the plaintiff plausibly alleged that the defendant, the school's football coach, "increased the risk of private danger" when he "promised to act" by ensuring future adult supervision in the locker room "in response to an incident that occurred on school grounds [], involving members of his . . . . team, after a similar incident occurred roughly one week prior in the same location," and yet failed to do so. *Id.* at 327–28.

This case is distinct from *DJ* for a number of reasons. Unlike the defendant in *DJ*, Defendant Harris did not have control or supervision over the assaulter in this case, Amari Pollard, the *former* HHS student who killed Shawn Jackson. Am. Compl. ¶¶ 3, 4. Neither the underpinning incident, when the Jacksons' home was "shot up," nor the ultimate, fatal shooting occurred on school grounds or in an area under HHS control; rather, the first occurred at a private residence,

and the second occurred in an open city park, seven minutes after Shawn exited from graduation and the secured environment of the Altria Theater. *See, e.g.*, *id*. ¶¶ 1, 9, 121, 157, 162. And these incidents were separated by over a year, whereas in *DJ* the two assaults occurred within seven days. *Id.* ¶ 121; *DJ ex rel. Hughes*, 488 F. Supp. 3d at 327. Further, there is no allegation that Defendant Harris gave affirmative promises to Plaintiff about Shawn's safety during graduation, or that Harris otherwise acted in a manner that could plausibly be construed as persuading Plaintiff that her concerns about Shawn's safety were absolved by some specific act being taken by Harris. *Cf. DJ ex rel. Hughes*, 488 F. Supp. 3d at 329 (finding material the allegation that the defendant had "conversations with [the victim's] parents regarding protections that would be put in place to prevent similar occurrences in the locker room"); *id.* at 323 ("Plaintiffs claim that based on [the defendant's] assurance, [the victim's] parents took no 'further action themselves to protect [the victim].'").

Based on these distinctions, the Court is not persuaded that the facts of the present case align with the reasons the substantive due process claim in *DJ* survived the 12(b)(6) stage. As such, the Court is not compelled to reach a similar outcome, here.

### ii. Harris's alleged "affirmative" acts did not cause or increase the risk faced by Shawn.

Moving past this case's distinctions from *DJ*, the Court finds that Defendant Harris's allegedly affirmative acts do not satisfy the "exactingness of the affirmative-conduct standard." *Turner*, 930 F.3d at 646. Specifically, the Court "resist[s] the temptation to . . . stretch[] the concept of 'affirmative acts' beyond the context of immediate interactions between [Harris] and the [P]laintiff," *Pinder*, 54 F.3d at 1176 n.*, in assessing what acts by Harris actually "create[d] or increase[d] the risk that resulted in [Shawn's] injury," *Burns-Fisher*, 57 F.4th at 425 (quoting *Graves*, 930 F.3d at 319).

The Court takes particular instruction from the Fourth Circuit's opinion in *Burns-Fisher v. Romero-Lehrer*, wherein the Fourth Circuit determined that the plaintiff had not properly alleged a violation of "her constitutional liberty interest in bodily integrity by establishing a state-created danger," because, "[a]t most, [the plaintiff] point[ed] to acts or omissions by [the defendant] that suggest [defendant] knew that [the assaulter] posed a risk to [the plaintiff], but nevertheless failed to prevent [the assaulter] from attacking [the plaintiff]." 57 F.4th at 424–25 (citation modified). The Fourth Circuit took specific notice of the plaintiff/appellee's allegation "that prior to the incident, Appellee requested that TB be removed from her class for her safety and the safety of the students in the class, but Appellant refused." *Id.* at 425 (citation modified). And yet, the court still found that "Appellant's alleged knowledge of TB's violent history and her failure to prevent TB from attacking Appellee are insufficient to constitute affirmative acts because 'the state must create *the direct danger* that causes the injury or death.'" *Id.* (emphasis added) (quoting *Callahan*, 18 F.4th at 148). The Fourth Circuit accordingly determined that, "[b]ecause the conduct Appellee has identified did not directly cause Appellee's injuries, Appellee did not sufficiently allege that her constitutional rights were violated." *Id.*

The same can be said for Plaintiff's allegations regarding Defendant Harris's conduct in the present case. To recap, Plaintiff alleges the following "acts" by Harris: (1) Harris approved Shawn's participation in HHS's homebound program; (2) Harris did not initiate a threat assessment, despite her knowledge of the threats to Shawn's life; and (3) Harris unilaterally approved Shawn's attendance at and participation in HHS's graduation ceremony. As the Fourth Circuit did in *Burns-Fisher*, the Court finds here that, at most, Plaintiff has pointed to acts (approving the homebound program, approving graduation attendance) or omissions (failing to initiate a threat assessment) by Harris that suggest Harris knew that Shawn faced some risk or

18

threat of harm, but that Harris nevertheless failed to prevent the attack on Shawn.  And, as in *Burns-Fisher*, the Court concludes that this alleged conduct did not directly cause, create, or increase the *direct* danger and harm that ultimately befell Shawn, i.e., his death at the hands of a non-HHS student, off HHS property and outside the control of Harris or HHS.  "As was true in *DeShaney*, [Harris] did not 'create' the danger, [she] simply failed to provide adequate protection from it." *Pinder*, 54 F.3d at 1175.  Indeed, the acts alleged here are arguably even farther from establishing an actionable "affirmative act" than those alleged in *Burns-Fisher*, where the defendant-appellant in fact *refused* to take certain protective steps requested by the plaintiff-appellee.  57 F.4th at 425.  Here, in contrast, Harris most relevantly simply "squeezed" Shawn into graduation, after Plaintiff affirmatively contacted Harris about Shawn's ability to attend.  Am. Compl. ¶ 68.

Based on the foregoing, "[b]ecause the conduct [Plaintiff] has identified did not directly cause [Shawn]'s injuries, [Plaintiff] did not sufficiently allege that [Shawn's] constitutional rights were violated." *Burns-Fisher*, 57 F.4th at 425.  Harris's "failure to protect by itself is not sufficient to trigger constitutional liability in this situation."  *Stevenson ex rel. Stevenson*, 3 F. App'x at 32.

### b. Dismissal is Not Procedurally Premature

Plaintiff urges the Court to allow discovery to occur before making a final determination on whether the state-created danger doctrine applies.  Opp'n Harris Mot. Dismiss 8.  In doing so, Plaintiff relies on two federal district court cases wherein the courts specifically acknowledged the cases' early procedural posture in denying the underpinning motions to dismiss.  *Id.* at 8–9 (citing *Doe #1*, 2021 WL 6072813 at *11–12; *DJ ex rel. Hughes*, 488 F. Supp. 3d at 328–29).  In the cited cases, which both involved school locker room assaults, the district courts found that the facts alleged "satisfied the elements of a Substantive Due Process Claim [sic] based on the right to bodily integrity in accordance with the state-created danger doctrine," while additional factual

development was necessary to determine whether the alleged acts were, in fact, sufficient to ultimately impose liability. *DJ ex rel. Hughes*, 488 F. Supp. 3d at 328–29; *see also Doe #1*, 2021 WL 6072813 at *11 ("Plaintiffs do appear to have satisfactorily set forth the elements of a substantive due process claim based on their constitutional right to bodily integrity under the state-created danger doctrine.").

Both of these cases are distinguishable from present circumstances, however, because—as set forth at length above—the Court has found here that Plaintiff's allegations *do not* satisfy the necessary elements of a substantive due process claim based on the constitutional right to bodily integrity under the state-created danger doctrine. *See, e.g.*, *supra* Part IV.A.2.a.i (distinguishing facts and 12(b)(6) analysis in *DJ ex rel. Hughes* from the present case). Moreover, there is certainly no binding legal rule that courts *must* allow bodily integrity/state-created danger claims to proceed to discovery, as demonstrated by the fact that in *Burns-Fisher*, the Fourth Circuit reversed the district court's denial of qualified immunity after finding that the allegations, on their face, failed to state a constitutional violation. 57 F.4th at 423, 425–26.

Based on the foregoing, the Court is not persuaded to permit the case to proceed to discovery when Plaintiff's allegations do not otherwise satisfactorily set forth the elements of a substantive due process claim. *Id.* at 425; *cf. Doe #1*, 2021 WL 6072813 at *11.

3.  Qualified Immunity

Because the Court has found that Plaintiff has not sufficiently alleged that Defendant Harris violated Shawn's constitutional liberty interest in bodily integrity, the Court does not need to reach the remaining question of whether Harris is entitled to qualified immunity. *E.g.*, *Burns-Fisher*, 57 F.4th at 424 (noting that, to determine whether a defendant is entitled to qualified immunity, an

essential aspect is whether the plaintiff alleged a violation of a federal right).  The Court will grant Harris's Motion to Dismiss as to Count II.

**B.  § 1983 Claims Against the School Board (Counts I & II)**

Plaintiff names the School Board in both of her § 1983 claims, Counts I and II.  In Count I, Plaintiff alleges that the School Board failed to properly train its administrators, staff, and employees, including Defendant Harris, and that the School Board had knowledge of a custom or policy of allowing its staff to violate students' constitutional right to body integrity.  Am. Compl. ¶¶ 172, 173, 177; *see also* Opp'n Sch. Bd. Mot. Dismiss 11–13.  As for Count II (Plaintiff's substantive due process claim discussed above with respect to Harris), Plaintiff generally alleges that "the Board and individual Defendants failed to protect Shawn Jackson, who was in their care and to whom they owed a duty of care," Am. Compl. ¶ 221.  In its Motion to Dismiss, the School Board argues that "to state a constitutional claim against the School Board, Plaintiff must show that an RPS employee took an affirmative action that created the danger that befell [Shawn]" and that "Plaintiff does not cross that threshold."  Sch. Bd. Br. Supp. Mot. Dismiss ("Sch. Bd. Br. Supp.") 2, ECF No. 64.

School boards are treated as municipalities for purposes § 1983.  *Riddick v. School Bd.*, 238 F.3d 518, 522 n.3 (4th Cir. 2000) ("In *Monell*, the Court recognized that school boards and municipalities are indistinguishable for purposes of § 1983.").  "Because [§] 1983 was not designed to impose municipal liability under the doctrine of respondeat superior, . . . . 'municipal liability [under § 1983] is limited to action for which the municipality is actually responsible.'"  *Id.* at 523 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)).  For a municipality to be deemed actually responsible, "the action that is alleged to be unconstitutional [must] implement[] or execute[] a policy statement, ordinance, regulation, or decision officially adopted

and promulgated by that body's officers," *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), or otherwise have been "caused by an identifiable municipal policy or custom."

With respect to Count II, wherein Plaintiff (ostensibly) endeavors to hold the School Board directly liable for violating Shawn's Fourteenth Amendment right to substantive due process, the Court easily finds that Plaintiff has failed to allege facts to support such a claim. Specifically, Plaintiff's factual allegations against the School Board fail to describe any Board action that itself was unconstitutional. Rather, Plaintiff's allegations against the School Board almost exclusively reference the School Board's failure to train RPS administrators, staff, teachers, and/or employees. *See* Am. Compl. ¶¶ 18, 173, 174, 177, 178, 186. The only two allegations that go beyond this simply state, in a conclusory manner, that "[t]he [School] Board was well aware of these [failure to train] issues but did nothing to address them," and that the School Board "failed to protect Shawn . . . , who was in their care." *Id.* ¶¶ 179, 221. These allegations are insufficient to state a substantive due process claim directly against the School Board, and so the Court will grant the School Board's Motion to Dismiss as to Count II.

With respect to Count I, which Plaintiff more properly formulates as a claim to hold the School Board liable for a constitutional violation resulting from an official policy or custom pursuant to *Monell*, *see id.* ¶ 171, the Court likewise finds that Plaintiff has failed to state a claim, because Plaintiff's allegations do not establish an underlying constitutional violation. *Grayson v. Peed*, 195 F.3d 692, 697 (4th Cir. 1999) (holding that, where "there are no underlying constitutional violations by any individual, there can be no municipal liability"), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389 (2015), *as recognized in Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023); *see also Stevenson ex rel. Stevenson*, 3 F. App'x at 33 ("Because we have already determined that [Plaintiff's] allegations do not amount to a § 1983 violation on the part of the

school officials, it follows that the school board likewise cannot be held constitutionally liable."); *O.W. ex rel. Bass*, 656 F. Supp. 3d at 621 (granting the defendants' motions because the plaintiff "fail[ed] to identify any underlying constitutional violations that the City or School Board could be liable for").

Specifically, the Court has already determined that Shawn was in no way in a special—i.e., custodial—relationship with any party, let alone a party carrying out School Board custom and policy, during the events at issue in this case. *See supra* Part IV.A.1. Moreover, the Court finds that its analysis rejecting Plaintiff's alternative state-created danger theory as to Defendant Harris, *see supra* Part IV.A.2, applies with equal force to any putative constitutional violation by the other actors described in the Complaint, e.g., RPS, Principal Gilstrap, Vice Principal Olds, and Superintendent Kamras. In particular, the Court reiterates its adherence to *Pinder*'s admonition that "courts should resist the temptation to inject this alternate framework [accepting a recharacterization of inaction into action] into omission cases by stretching the concept of 'affirmative acts' beyond the context of immediate interactions between the [defendant] and the plaintiff." *Pinder*, 54 F.3d at 1176 n.*. While Shawn's death was undoubtably tragic, Plaintiff's allegations do not give rise to a reasonable inference that the named actors created the danger Shawn faced and to which he ultimately fell victim. *See id.* at 1175 ("[T]he state did not 'create' the danger, it simply failed to provide adequate protection from it. . . . [T]he most that can be said of the state functionaries . . . is that they stood by and did nothing when suspicious circumstances dictated a more active role for them.").

Because Plaintiff fails to allege an underlying constitutional violation, there can be no municipal liability in this case. Accordingly, the Court will grant the School Board's Motion to Dismiss as to Count I, as well.

**C. The Court Will Decline to Exercise Supplemental Jurisdiction Over Remaining State Law Claim (Count III)**

Federal district courts have supplemental jurisdiction over state law claims when those claims "form part of the same case or controversy" as a federal claim. 28 U.S.C. § 1367(a). Supplemental jurisdiction is not automatic, and district courts may decline to exercise supplemental jurisdiction over state law claims if the court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). Supplemental jurisdiction is a discretionary doctrine and district courts "enjoy a wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995). However, both the Fourth Circuit and the Supreme Court favor dismissing state law claims if the federal claims are extinguished prior to trial. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); *Banks v. Gore*, 738 F. App'x 766, 773 (4th Cir. 2018) ("Generally, when a district court dismisses all federal claims in the early stages of litigation, it should decline to exercise jurisdiction over any remaining pendent state law claims by dismissing those claims without prejudice." (first citing *Gibbs*, 383 U.S. at 726; and then citing *Carnigie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988))).

When determining whether to exercise its discretion to retain jurisdiction, a court considers "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Shanaghan*, 58 F.3d at 110. However, "when all federal claims are dismissed early in the litigation, the justifications behind pendent jurisdiction—'considerations of judicial economy, convenience and fairness to litigants'—are typically absent" and weigh against exercising supplemental jurisdiction. *Alexandria Resident*

*Council, Inc. v. Alexandria Redevelopment & Hous. Auth.*, 11 F. App'x 283, 287 (4th Cir. 2001) (quoting *Gibbs*, 383 U.S. at 726).

At this juncture all federal claims have been extinguished prior to trial, and the only remaining claim relies entirely upon Virginia state law. Therefore, the aforementioned factors uniformly favor dismissal. The remaining count does not directly involve federal policy and is entirely a state law claim. Therefore, allowing a Virginia state court to address state law matters "would best serve judicial economy." *Thornton v. Piedmont Reg'l Jail Auth.*, 2025 WL 888417, at *12 (E.D. Va. Mar. 21, 2025). Moreover, this Court has not decided any disputed state-law claims and all pre-trial matters were previously stayed pending the resolution of the current Motions to Dismiss. Given that Fourth Circuit precedent "evince[s] a strong preference that state law issues be left to state courts in the absence of diversity or federal question jurisdiction," the Court will decline to exercise supplemental jurisdiction and will dismiss the remaining count without prejudice. *Arrington v. City of Raleigh*, 369 F. App'x 420, 423–24 (4th Cir. 2010); *Thornton*, 2025 WL 888417, at *12; *Johnson v. Exeter Fin. LLC*, 2024 WL 4336615, at *4–5 (E.D. Va. Sept. 27, 2024).

### D.  Motion to Amend

Finally, Plaintiff has requested leave to file a Second Amended Complaint based on additional information that Plaintiff has received. Mem. Supp. Mot. Amend 1. The Court will deny Plaintiff leave to amend because the proposed amendment would be futile.

The decision whether to grant leave to amend rests "within the sound discretion of the district court." *Davis v. Va. Commonwealth Univ.*, 180 F.3d 626, 628 (4th Cir. 1999) (citing *Foman v. Davis,* 371 U.S. 178 (1962)). However, Courts will "freely give" a party leave to amend their complaint "when justice so requires." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006). Federal

Rule of Civil Procedure 15(a)(2) is a "liberal rule" that favors "resolving cases on their merits instead of disposing of them on technicalities." *Id.* Courts will only deny leave to amend when it would prove to be prejudicial to the opposing party, "there has been bad faith on the part of the moving party, or the amendment would have been futile." *Id.* An amendment is futile where the amended complaint could not survive a motion to dismiss. *See Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995). "Leave to amend should be denied on the ground of futility only when the proposed amendment is clearly insufficient or frivolous on its face." *Cappetta v. GC Servs. P'ship*, 2009 WL 482474, at *4 (E.D. Va. Feb 24, 2009) (citing *Davis*, 615 F.2d at 613).

Defendants argue that they would be prejudiced by amendment, that Plaintiff proposed the amendment in bad faith, and that amendment would be futile. Harris Opp'n Mot. Amend 1–2; Sch. Bd. Opp'n Mot. Amend 1–2. The Court will address the Defendants' futility argument first, because this issue is dispositive.

Both Defendants argue that Plaintiff's proposed amendments are futile because she fails to allege facts required to establish a state-created danger or a special relationship between Defendant Harris and Shawn, Harris Opp'n Mot. Amend 10–12, or to state a § 1983 claim under *Monell*, Sch. Bd. Opp'n Mot. Amend 4–9. Plaintiff contends that amendment is not futile and submits that the Second Amended Complaint ("SAC") states viable claims against both Defendants. Mem. Supp. Mot. Amend 1, 6–7; Reply Harris Opp'n 5–6; Reply Sch. Bd. Opp'n 4.

Plaintiff's proposed amendments are minimal. *See* Mem. Supp. Mot. Amend 1–3. She seeks leave to add the following six allegations:

1. That the School Board should have known that students and family members often gather outside of the Altria Theater following graduation ceremonies. Second Am. Compl. ("SAC") ¶¶ 3–4.

2.    That Shawn Jackson's stepfather, Renzo R. Smith, also died that day, and that no one has been charged with his murder. *Id.* ¶¶ 8–9.

3.    That Defendant Harris failed to comply with state law and school policies when she failed to prepare an initial Behavioral Threat Analysis and when she allowed Jackson to participate in graduation. *Id.* ¶¶ 17–21, 24, 26–27, 214.

4.    That Defendant Harris knew the identities of the students who threatened Shawn Jackson. *Id.* ¶ 17.

5.    That Plaintiff believes Amari Pollard was part of the group of Huguenot students who wanted to kill Shawn Jackson. *Id.* ¶ 7.

6.    That the School Board failed to train its employees, including Defendant Harris, on reporting duties and policies related to the Threat Assessment handbook. *Id.* ¶¶ 25–27, 185, 215–16.

None of the amended allegations are sufficient to revive the claims the Court previously determined to be deficient in its Motion to Dismiss analysis, *supra*. Plaintiff fails to allege facts to demonstrate that Jackson was under Defendant Harris's control, as required to constitute a special relationship. Nor does the fact that Defendant Harris allegedly learned the identities of the students who *threatened* to harm Jackson around February 2023 materially alter the Court's state-created danger analysis, as it was not these students who ultimately shot and killed Shawn. SAC ¶¶ 15–17, 131; *see Burns-Fisher*, 57 F.4th at 425 (rejecting the plaintiff's argument that knowledge of the student's prior acts of violence and failure to comply with policy constituted affirmative acts). Rather, the fact remains that *former* HHS student Amari Pollard killed Shawn, and nothing in the facts plausibly supports a conclusion that Defendant Harris had control—or even potential control—over Pollard. SAC ¶¶ 5–7, 15–16, 23. But more importantly, Plaintiff's amended

27

allegations fail to point to any affirmative action by Defendant Harris or any other state actor that created or increased the danger that resulted in Shawn's death.  In other words, even if it were to incorporate the amended allegations into its calculus, the Court would find that neither Defendant Harris's alleged conduct nor that of any employee of the School Board "directly cause[d] [Shawn Jackson's] injuries." *Burns-Fisher*, 57 F.4th at 425; *see generally* SAC.  And, absent any plausibly alleged constitutional violation, there remains no *Monell* liability against Defendant School Board.

Based on its determination of futility, the Court will deny Plaintiff's Motion for Leave to Amend.

### V. CONCLUSION

For the foregoing reasons, Plaintiff fails to state any § 1983 claim against Defendants Harris and the School Board.  Thus, the Court will grant Harris's and the School Board's respective Motions to Dismiss as to Counts I and II, with prejudice.  Further, the Court will exercise its discretion to dismiss the remaining state law claim, Count III, without prejudice.  Finally, the Court will deny Plaintiff's Motion to Amend, because the proposed amendment would be futile.

An appropriate Order will accompany this Memorandum Opinion.

_____ /s/_____
Roderick C. Young
United States District Judge

Date: July 18, 2025
Richmond, Virginia

28